UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | 21-CR-145-JLS |
| DYLLAN BARBER, | SENTENCING MEMORANDUM AND CHARACTER LETTERS |
| Defendant. | |

_____

## I.      Introduction

On October 18, 2021, Dyllan Barber entered a plea pursuant to a plea agreement to a single count of cyberstalking in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(5).  Sentencing in this case is scheduled for April 20, 2022, at 2:00 PM.  We respectfully submit the following sentencing memorandum and letters for the Court's consideration at sentencing.

## II.     Factual Summary

On November 30, 2019, Dyllan Barber—then age 18 and a senior in High School—falsely told the victim in this case that his snapchat account had been hacked.  (PSR at ¶12).  Dyllan–pretending to be the "hacker"–threatened that he would release nude images of victim, and of Dyllan, if victim did not send him sexually explicit images.  The victim told law enforcement that in response to this, the victim sent multiple sexually explicit images to the "hacker."  (PSR at ¶ 17).  These images were never recovered and there is no evidence they were ever shared or transferred to another device.

### III. Remorse and Acceptance of Responsibility

Dyllan has expressed sincere remorse for his actions in this case. During the pre-sentence interview he stated "I've changed significantly since I was in high school. I feel horrible because I knew [the victim]. I am not the same person that did this two years ago." Dyllan wants to apologize to the victim, but has not had contact with her since his arrest. While Dyllan was uncertain about his motivation, he agreed that his immaturity at the time contributed to his behavior. Since his arrest he has been journaling his thoughts to relieve stress and gain insight about his conduct.

### IV. Dyllan's History and Characteristics

Dyllan's parents divorced when he was 5-years-old. He was raised primarily by his mother, and has a poor relationship with his father. Growing up, Dyllan recalls that his father did the "bare minimum," one example he brought up during the pre-sentence interview was that he would invite his father to attend his football games and other events and his father would decline to attend. (PSR at ¶ 62). Dyllan's mother, Amanda Frentz, recalls that she often had to work two to three jobs while Dyllan was growing up, and that she leaned on him to help care for his younger brothers. (Letter from Amanda Frentz). She recognizes that this put a lot of pressure on Dyllan, but is impressed that he has always been there for his younger brothers.

In school, Dyllan struggled. An evaluation from 2014 when Dyllan was in 6th Grade indicates that Dyllan received Special Education services for ADHD and that he had difficulty fitting in with his peers. (PSR at ¶76). Dyllan was bullied throughout his time in school and had difficulty building relationships with others. (PSR at ¶68, 76).

My office retained Dr. Ralph Benedict, a clinical psychologist, to interview Dyllan and review his school records. As quoted in the PSR, Dr. Benedict found that "Mr. Barber's ADHD is, and has been severe. The illness had significant impact on his psychological development and social adjustment. The effects of his psychiatric disorder have been particularly debilitating because Dyllan lacks the cognitive resources found in the average person." (PSR at ¶71).

Despite these challenges, Dyllan graduated from high school in 2020 with a welding certificate and OSHA training. When Dyllan finished school, he intended to join the military. He contacted the National Guard but was delayed in enlisting due to the COVID-19 outbreak. Dyllan started a job as a corrections officer at the Cattaraugus County Jail where he worked up until his arrest in this case. Following his arrest, Dyllan was fired by the Sheriff's department. He eventually relocated to Elmira, NY with his girlfriend and found work as a welder. Due to health issues, Dyllan could not continue in his welding job. He found an alternative and is presently working at Tops in Elmira.

Dyllan's family and friends have submitted several letters to Your Honor for consideration at sentencing. They describe Dyllan as caring, loyal, kind, genuine, honest, and reliable. They have supported him throughout this case, and write that they will continue to be his support system after sentencing and beyond.

Dyllan's mom, Amanda Frentz, writes that Dyllan "is the one that would be on the sidelines for every sporting event for his brothers and show he's proud of them when their dad didn't. Dyllan has always been the one who would take his brothers on adventures to go swimming or play basketball or build a fort in the living room." She recalls that when Dyllan started working, he would contribute money to help with household expenses, and would buy groceries for her when she wouldn't take his money. (Letter from Amanda Frentz).

Lucas and Hunter Barber, Dyllan's two younger brothers, both write that Dyllan has been a great role model and a supportive brother. (Letters from Hunter and Lucas Barber).

Dyllan's girlfriend, Brionna Washburn, writes that she has seen a significant change in Dyllan throughout this court case. She recalls that he had to move two hours away to live with her in Elmira due to negativity, threats, and harassment he encountered in his hometown. (Letter from Brionna Washburn).

Janet Priest, a teacher's aide who worked with Dyllan in school, recalls Dyllan as a student she could depend on for help. And that she would sometimes call on Dyllan to serve as a positive role model when she saw another student "headed down the wrong path." (Letter from Janet Priest, Teacher's Aide).

All of these individuals know Dyllan to be a kind and decent young man who has developed substantially since his time in high school. They care about Dyllan and will help to ensure he does whatever is required of him to satisfy the terms of his sentence in this case.

### V.      Dyllan's Health

As previously discussed in Defendant's Motion to Remain on Release Pending Sentence (Docket No. 25), Dyllan is in poor physical health. He has been diagnosed with several gastric disorders including gastroesophageal reflux disease ("GERD") with esophagitis and hemorrhage. While GERD is a common physical ailment, Mr. Barber's condition causes him to have fits where he experiences sharp pain and vomits blood. He has been hospitalized for this and diagnosed with a bleeding ulcer which his physician attributed to stress in his life. Adding to his poor health, Mr. Barber is morbidly obese, weighing 419 pounds at his last doctor's visit. Mr. Barber has sought counseling for his anxiety and currently does journaling exercises to deal with his stress.

VI.    **Dyllan's Age as a §3553(a) factor**

Dyllan was 18 years old and in high school at the time of this offense. Psychologists, neuroscientists, and social scientists have published extensively over the past decade on the topic of how the human brain continues to develop well beyond age 18.

In a recent opinion, Judge Rakoff, United States District Judge for the Southern District of New York, reviewed and discussed this research at length. *United States v. Ramsay*, 538 F. Supp. 3d 407, 417 (S.D.N.Y. 2021).[1] The *Ramsay* case deals with a sentencing reduction request for a defendant who was 18 when he committed a murder in aid of racketeering, leading to a life sentence. While the crime is certainly different, Mr. Ramsay was the same age as Dyllan when he committed his offense, and the research and analysis in the *Ramsay* case is helpful in thinking about Dyllan's case.

The *Ramsay* decision outlines several attributes of adolescence[2] that are relevant to sentencing, including: immaturity, susceptibility, and salvageability. *Ramsay* at 417-23.

---

[1] This decision draws from recent Supreme Court cases dealing with juvenile defendants, in particular *Miller v. Alabama*, 567 U.S. 460, 472, 132 S. Ct. 2455, 2465, 183 L. Ed. 2d 407 (2012); *Roper v. Simmons*, 543 U.S. 551, 569, 125 S. Ct. 1183, 1195, 161 L. Ed. 2d 1 (2005); and *Graham v. Fla.*, 560 U.S. 48, 68, 130 S. Ct. 2011, 2026, 176 L. Ed. 2d 825 (2010), as modified (July 6, 2010). While these cases deal with juvenile defendants, *Ramsay* deals with a defendant who (like Dyllan) was 18 at the time of the offense. Additionally, *Ramsay* provides a framework for analyzing the §3553(a) factors in a case with a young, but not juvenile, defendant.

[2] *Ramsay* uses the term "adolescence" frequently in the analysis of sentencing for an 18-year-old defendant. "Adolescence" generally refers to ages 10-19. *see Age limits and adolescents* (2003). Paediatrics & child health, 8(9), 577–578. https://doi.org/10.1093/pch/8.9.577; see also World Health Organization, Adolescent Health, available at https://www.who.int/health-topics/adolescent-health, ("Adolescence is the phase of life between childhood and adulthood, from ages 10 to 19").

### a. Immaturity

Psychologists and neuroscientists have found that the brain continues to develop well into the mid-20's. As the research puts it "[t]he frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life."[3]

Furthermore, psychologists distinguish between "cold cognition" and "hot cognition." "*Cold cognition* refers to mental processes (such as working memory or response inhibition) employed in situations calling for deliberation *in the absence of high levels of emotion*."[4] **Hot cognition,** by comparison, involves mental processes "***typically made under emotionally arousing circumstances.***"[5] Studies show that young adults (ages 18-21) typically make "cold cognition" decisions similar to older adults; however, when it comes to "hot cognition" decisions, those made under emotionally charged circumstances, those same 18-to-21-year-olds perform more similarly to younger teenagers.[6]

---

[3] Sara B. Johnson et al., Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy, 45 J. Adolescent Health 216 (2009) (NIH Public Access Version), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf, at 1, *cited* in <u>Ramsay</u> at 418.

[4] Grace Icenogle, Laurence Steinberg, Natasha Duell, Jason Chein et. al., Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for A "Maturity Gap" in A Multinational, Cross-Sectional Sample, 43 Law & Hum. Behav. 69, 71 (2019), cited in <u>Ramsay</u> at 419-20.

[5] Id.
[6] Id.

Here, Dyllan used extremely poor judgment in an emotionally charged situation and committed a serious crime. Dyllan's conduct in this case would appear to fit the category of "hot cognition," where psychiatrists have found 18-to-21 year olds function more like younger teenagers in their decision-making.

Notably, however, Dyllan does not make any of these excuses for this behavior, nor does he try to minimize what he did. He does believe that his lack of maturity played a role, as he stated during the pre-sentence interview "I feel horrible because I knew [the victim] … he acknowledged that his behavior reflected his immaturity [and] He shared that [at the time] he did not realize the severity of his actions." (PSR at ¶25).

### b. Susceptibility

The *Ramsay* Court also discussed the influence of peer pressure, and in particular, that research shows an increased susceptibility to peer pressure until at least age 18. To his credit, Dyllan does not try to blame anyone in his peer group for this offense, he recognizes that it was his conduct and his conduct alone that put him in the situation. It is notable that throughout his time in school, Dyllan experienced frequent bullying, and had trouble fitting in with his peers and building relationships with other kids. (PSR at 68, 76).

### c. Salvageability

Salvageability refers to the fact that "the vast majority of adolescents who engage in criminal or delinquent behavior desist from crime as they mature." *Ramsa*y at 422, *quoting* Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty, 58 Am. Psych. 1009, 1014

(2003). Adolescents who engage in criminal behavior, including serious crimes, are likely to outgrow these tendencies as they mature into adulthood. *Ramsay* at 422.

This concept seems particularly relevant to Dyllan, who had no prior involvement with the criminal justice system, and has been on pretrial supervision for approximately the past 17 months without incident. During this time Dyllan has maintained good relationships with his family and his girlfriend. He has relocated to try and get a fresh start and is gainfully employed. He has plans for the future, and hopes to learn from this experience but move on from it as best he can. He has been subject to strict conditions of supervision for this entire period of release, including electronic monitoring of his whereabouts and monitoring of any electronic devices (phones, computers, etc.). Probation has not raised any concerns about his conduct during this period, and his pretrial supervision officer indicates that he has been compliant with his conditions of supervision. (PSR at ¶ 10). Dyllan has demonstrated that he can be a law-abiding citizen, and that he is not the same person he was as an 18-year-old high school student.

Notably, while he has made progress, Dyllan will have to deal with the repercussions of this offense for the rest of his life. He now has a felony conviction, he lost his job as a corrections officer, and he will most likely be precluded from fulfilling his lifelong dream of serving in the military. Additionally, the plea agreement requires that Dyllan register as a sex offender for this conviction.[7] Regardless of the punishment imposed in this case, Dyllan will be dealing with long-lasting consequences for many years to come.

---

[7] Assuming Dyllan remains in New York, Registration for this offense would be handled by the New York State. The Board of Sex Offender Examiners has informed counsel, however, that this is *not* a registerable offense in New York. The U.S. Probation Office has indicated that in these cases (where an offense is not registerable in NY), the defendant must submit paperwork to NY and receive confirmation that they do not have to register—that confirmation then satisfies their registration requirement as a condition of supervised release.

### d. Why does Dyllan's age matter?

*Ramsay* provides a helpful summary of why an 18-year-old defendant's youth should matter in sentencing:

> The need for "just punishment" corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult." Roper, 543 U.S. at 570, 125 S.Ct. 1183. Thus, a "just punishment" for an adolescent is usually less severe than a "just punishment" for a similarly situated adult.
>
> Youths' immaturity — particularly in the context of "hot cognition" decisions made in the presence of peers — also lessens the value of deterrence because adolescents' "immaturity, recklessness, and impetuosity make them less likely to consider potential punishment." Miller, 567 U.S. at 472, 132 S.Ct. 2455.
>
> The need to incapacitate also applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior, both because adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary inadequacies of the adolescent brain.
>
> Finally, rehabilitation is one of the congressionally enumerated goals of criminal sentencing, and adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders. Moreover, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

United States v. Ramsay, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021)

Dyllan's age is particularly relevant to his sentencing because of his relative immaturity at the time of the offense and the likelihood that this contributed to his poor decision making in an emotionally-charged situation. Additionally, Dyllan's young age increases his potential for rehabilitation—which is corroborated by his good conduct over the past 17 months of supervision. Dyllan was an immature 18-year-old who made a terrible decision to engage in serious criminal

conduct. He is sincerely remorseful, and he has demonstrated that he can be rehabilitated, is unlikely to recidivate, and is capable of living a productive and law-abiding life.

### VII. Conclusion

The defense respectfully asks that in imposing a sentence the Court consider the factors listed by the Probation Officer in the PSR, specifically:

- "the defendant's youthful age at the time that he committed the instant offense;
- history of learning disabilities and other cognitive impairments;
- his remorse for his conduct in the instant offense;
- overall favorable adjustment to pretrial supervision;
- the defendant's lack of criminal history;
- the defendant's employment record and potential for future gainful employment;
- his presence of strong family support;
- and the potential for the defendant to be rehabilitated through counseling and/or other mental health intervention."
(PSR at ¶88).

For all of these reasons, we ask that the Court impose a reasonable sentence that is sufficient but not greater than necessary.

**DATED**:      Buffalo, New York, March 25, 2022

                                                   Respectfully submitted,

**/s/ Brian P. Comerford**
Brian P. Comerford
Supervisory Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341, (716) 551-3346 (Fax)
brian_comerford@fd.org

**TO:**   Dawn M. Carter, Assistant United States Attorney
        Ashley S. McNeal, United States Probation Officer